## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| IN RE:  MOTIONS TO CERTIFY CLASSES AGAINST COURT REPORTING FIRMS FOR CHARGES RELATING TO WORD INDICES _____/ | *Adelson v. U.S. Legal Support, Inc., et al.* (Case No.:  09-CV-21527)  *Glenn J. Webber, P.A. v. Esquire Deposition Servs., LLC* (Case No.:  09-CV-21538)  *Public Concepts, LLC v. Veritext Corp.* (Case No.:  09-CV-21539)  (unconsolidated cases) |

### ORDER DENYING CLASS CERTIFICATION AND DISMISSING CASES FOR LACK OF SUBJECT MATTER JURISDICTION

Before the Court are three motions for class certification in *Adelson v. U.S. Legal Support, Inc., et al.* (Case No.:  09-CV-21527), *Glenn J. Webber, P.A. v. Esquire Deposition Servs., LLC* (Case No.:  09-CV-21538), and *Public Concepts, LLC v. Veritext Corp.* (Case No.:  09-CV-21539).  In each case the plaintiffs allege that the defendants, court-reporting firms, violated Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) and were unjustly enriched by a billing practice under which the defendants charged the same rate for transcript pages and index pages.[1]  Although the Court has not formally consolidated these cases, because each case has overlapping legal issues, the Court has frequently dealt with the cases jointly, and because the Court concludes that common factual and legal issues control the certification decision, the Court disposes of the motions jointly.

---

[1]     Throughout this order, the Court distinguishes between transcript and index pages.  By the use of this distinction in terminology, which the Court uses for convenience only, the Court does not intend to indicate that the index is not actually part of the transcript.  "Transcript pages," in the sense of this order, refers to cover pages, appearance pages, certification pages, pages that include recorded testimony, and any other pages that are not "index pages."  "Index pages" are those pages that generally appear at the end of a transcript and, as alleged in the complaints, consist of a "listing of words appearing in the transcript and a designation of the place in the transcript where the words appear."  A typical index entry might read "**insurance** 1:3 5:11," indicating that the term "insurance" appears on page 1, line 3 and page 5, line 11.

For the reasons set forth below, the Court declines to certify the proposed classes. Accordingly, the motions for class certification are denied, and each case is dismissed for lack of subject matter jurisdiction.

## **INTRODUCTION**

This litigation centers on the fair pricing of the word indices included with transcripts. These word indices are computer generated and their production does not require the services of a trained or licensed court reporter. Nonetheless, the defendants charge their customers the same per-page amount for the computer-generated indices as for the court-reporter generated transcript pages.

The Court is mindful that it should not delve into the merits of a claim in deciding whether to certify a proposed class. For that reason, in reaching the decision below, the Court does not consider whether the complaints state a meritorious claim for relief. Nonetheless, the Court believes that an analysis of the nature of the plaintiffs' claims is appropriate in resolving the motions for class certification. Essentially, each plaintiff's claim is premised on the assumption that there is an unquestionably true or fair price for each index page and that the price of each index page must be lower than the price of each transcript page. Although court-reporting services are somewhat regulated, the plaintiffs have pointed to no authority (and the Court's own research has revealed none) supporting this proposition. Indeed, to the extent any authority exists on fair pricing for index pages, that authority undermines the plaintiffs' position. For instance, the federal judiciary's policies specifically allow court reporters to charge the same rate for transcribed and index pages. *See* 6 GUIDE TO JUDICIARY POLICY *Court Reporting* § 520.46 (2009) ("The court reporter may charge for the index page as a full page of transcript."). And the plaintiffs' contention that the more labor-intensive elements of a composite good must be more expensive than the less labor-intensive elements of the good, taken to its logical conclusion, would upend the manner in which the most ordinary commercial transactions are undertaken. Under the plaintiffs' theory, for example, a fast-food establishment would have to provide customers with an itemized receipt setting forth the price of each of the components of a cheeseburger. Otherwise, if the restaurant charged the same amount for the cheese and beef patty, without providing such a receipt, the plaintiffs would conclude that the restaurant was acting unfairly or deceptively in

violation of Florida law.  In sum, if the Court accepted the plaintiffs' view of FDUTPA, the American public would find itself surrounded by countless examples of "unfair" or "deceptive" conduct or practices, many of which are and have been long accepted as a normal part of life.  American commerce has advanced to its present robust state without a requirement that merchants supply their customers with detailed price breakdowns and elaborate component lists.  The absence of such a requirement is less evidence of a lack of insightful policymakers or lawyers than it is evidence that a failure to provide detailed pricing information is neither illegal nor immoral, unethical, oppressive, or unscrupulous.

But setting aside the merits-based analysis as the Court must do when reviewing motions for class certification, several issues preclude certification of the proposed classes.  Among these issues, the opposition briefs and record indicate that numerous prospective class members negotiated special rates with the court-reporting firms while others did not, some members were repeat customers while others had one or very few transactions, and some members reviewed invoices while others did not.  These factual differences, and their attendant legal implications, defeat the predominance requirement. There are also extreme administrative difficulties with the class.  One salient difficulty is that it would be an extraordinarily labor-intensive process to determine who ultimately paid for the transcript in question:  some lawyers, for example, were hired on a contingency basis and may not have passed costs on to their clients.   Then, after identifying the class members, it would be virtually impossible to determine damages on a class-wide basis because, as the record demonstrates, each class member subjectively values the index.  Therefore, establishing damages where the value of the index varies from consumer to consumer would be another extraordinarily labor-intensive process. Merely determining the identity of class members and ascertaining the value that they individually attach to the indices would be such a monumental task that it would outweigh any of the potential benefits flowing from class certification.

## BACKGROUND

### A.    The Complaints

The complaints allege that the defendants' practices with respect to "charging, overcharging, billing and/or collecting fees for multi-page computer-generated word indexes related to transcripts of depositions, hearings, or other proceedings" violated

FDUTPA and caused the defendants to be unjustly enriched.  Based on these alleged violations, the plaintiffs brought suit on behalf of "all persons and entities in Florida who or which, during the four years prior to the filing of [the lawsuits] and during the pendency of [these lawsuits], paid for a word index for a transcript at the per page rate charged by [the defendants] for transcription services."

The plaintiffs contend that the defendants' index charges are unlawful because "[w]hile the transcription [of] spoken word, such as a deposition examination and testimony, requires the labor and skill of the licensed court reporter, the deposition index is generated by a computer software program," and the creation of the index "does not require or involve any particular labor or skill on the part of the licensed court reporter, is not a transcription of testimony, and is not even a part of the official legal transcript of the deposition, hearing or trial."  According to the plaintiffs, the defendants acknowledge the difference between transcript and index pages because they compensate their court reporters "based on the number of pages of spoken word they transcribe and not based upon the number of pages of the index attached to the particular transcript."

The plaintiffs also contend that the defendants should charge different prices for transcribed pages and index pages because the indices do not constitute a part of the transcript.  The plaintiffs support this contention by citing to various definitions of transcript, including the one set forth in *Black's Law Dictionary* (6th ed.), which defines "transcript" as "that which has been transcribed . . . commonly . . . the record of a trial, hearing or other proceeding as prepared by a court reporter."

In sum, the plaintiffs contend that the defendants' billing practices are unfair or deceptive because the defendants knowingly or intentionally charged for the same per-page price for transcript and index pages without disclosing this practice to their customers.

### B.      The Motions for Class Certification

All three motions seek certification of a class consisting of

[a]ll persons or entities who or which, for the four years prior to the filing of this action and during the pendency of this action (the "class period") paid for a word index to a transcript and did so at a transcription per page rate in connection with court reporting services provided by the [d]efendant in Florida.  The class excludes counsel representing the class.

(D.E. #23 at 3 (*Adelson*); D.E. #34 at 4 (*Webber*); D.E. #25 at 5 (*Public Concepts*)).

All motions seek to certify the above class based on the defendants' practice of charging the same rate for transcript and index pages without disclosing that practice to their customers. The plaintiffs contend that the Court should certify this class under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

To justify certification under Rule 23(a) the plaintiffs argue that the elements of numerosity, commonality, typicality, and adequacy of representation are satisfied. The plaintiffs contend (and the defendants do not dispute) that the proposed class consists of a sufficient number of people (thousands) to justify certification. Commonality exists, according to the plaintiffs, because the FDUTPA and unjust enrichment claims arise out of the same billing practice which was applied uniformly to most of the defendants' customers. To satisfy typicality, the plaintiffs argue that their claims are similar to those of the prospective class members. Finally, the plaintiffs argue that they are adequate representatives of the putative class because the plaintiffs' interests are aligned with those of the putative class members and the plaintiffs will adequately prosecute the class action. The defendants do not dispute that the plaintiffs' attorneys are qualified to serve as class counsel.

To qualify for certification under Rule 23(b)(3) the plaintiffs argue that the questions of law or fact common to class members predominate over questions affecting the class representatives and there is no superior method to fairly and efficiently adjudicate the controversy. The plaintiffs argue that proof of their FDUTPA and unjust enrichment claims is "generalized" because those claims arise out of the defendants' uniform policies and practices of charging for word indices at "per page transcription rates." The plaintiffs further argue that individual factual questions do not exist because FDUTPA lacks a reliance requirement and the only issue is whether the billing practices are likely to deceive a consumer acting reasonably in the same circumstances. According to the plaintiffs, damages are ascertainable using common evidence that the defendants maintain, and the fact that class members may have differing damages is insufficient to defeat class certification. Finally, the plaintiffs contend that a class action is the superior method of resolving this dispute because the four superiority elements set forth in Rule 23(b)(3), including the "likely difficulties in managing a class action," are satisfied. With

respect to the difficulties in managing the class action, the plaintiffs argue that this factor is rarely sufficient to preclude certification and the putative class members can be readily ascertained from the defendants' databases and notified by U.S. mail or publication.

1. ***Dr. Charles A. Adelson and Jacqueline Lauzerique v. U.S. Legal Support, Inc. and Klein, Bury, Reif, Applebaum & Assoc., Inc.***

In the *Adelson* case, Dr. Charles A. Adelson and Jacqueline Lauzerique sued U.S. Legal Support and its predecessor (Klein, Bury, Reif, Applebaum & Associates, Inc.).[2] Before filing their lawsuit, Adelson and Lauzerique were involved in separate lawsuits related to personal injury and wrongful death, respectively. Their attorneys in those cases used the court-reporting services of U.S. Legal Support. Adelson and Lauzerique filed the present lawsuit after learning that U.S. Legal Support might have overcharged them for index pages.

In 1996, Adelson, a dentist, sued Time Warner and Sports Illustrated after he was injured in a sumo wrestling event in which he participated. In connection with his lawsuit against Time Warner and Sports Illustrated, Adelson did not order depositions, receive invoices, or pay court reporter bills. Adelson's second lawsuit was a legal malpractice action filed against the attorneys who represented him in his litigation against Time Warner and Sports Illustrated. In the malpractice case, Adelson paid deposition costs, though he did not order the depositions himself and is unaware of his attorneys' agreement, if any, with U.S. Legal Support. The malpractice case ultimately settled, and Adelson paid the court-reporting expenses out of the proceeds of his settlement. Adelson's attorney in the malpractice case negotiated and received a special rate for each index page from U.S. Legal Support. Adelson's attorney concluded that the court-reporter expenses incurred on behalf of Adelson were "reasonable and necessary" for the litigation.

The other plaintiff here, Lauzerique, was a plaintiff in a wrongful death case. She employed her attorney under a contingency fee agreement. Under that agreement, her attorney was responsible for paying all expenses, including court reporter expenses. Once the lawsuit settled, the attorney was reimbursed for the expenses from the

---

[2]     Throughout this order, the Court will use "U.S. Legal Support" to refer to both U.S. Legal Support, Inc. and Klein, Bury, Reif, Applebaum & Associates, Inc.

settlement proceeds.  Lauzerique's arrangement with her attorney, however, was not a pure contingency fee arrangement in that she paid a retainer of "several thousand dollars" so that her attorney could investigate her case, and it is unclear whether any of this retainer went towards court-reporter expenses.  Her attorney knew that the depositions he ordered included word indices, and he conceded that he could have determined the charge for the word indices if he compared the transcripts with U.S. Legal Support's invoices.

According to U.S. Legal Support, the proposed class definition is overbroad because it includes customers who have paid for a word index knowing that they were paying the same per-page rate for transcript and index pages, vague because it does not take into account the possibility that more than one person or entity has paid for the court-reporting services, and unascertainable because determining class membership under the proposed definition would require an individualized inquiry to identify the ultimate payor of U.S. Legal Support's services.

U.S. Legal Support also argues that the proposed class fails to meet the requirements of Rule 23(a).  U.S. Legal Support argues that the "adequacy" element is not satisfied because conflicts of interest exist among class members.  One such conflict is that the class includes attorneys and clients who value the index differently.  Another conflict exists because the class includes attorneys who, by passing overcharges on to their clients, may have breached ethical obligations that require attorneys to ensure that expenses are reasonable.  U.S. Legal Support's argument is that "[i]f charging for the word index is indeed an 'immoral, unethical, oppressive, unscrupulous' practice," then "some clients may look to their attorneys who ordered the index for recovery" and those attorneys "may respond that their expenditures were perfectly reasonable—like Mr. Adelson's attorney did at one point in his deposition."  (D.E. #33 at 12.)

U.S. Legal Support also argues that the plaintiffs cannot establish Rule 23(b)(3) predominance because there are individualized factual and legal issues and a class action is not the superior method of adjudicating this claim.  The principal individualized legal issue involves the applicability of FDUTPA to non-Florida class members.  With respect to individualized factual issues, U.S. Legal Support argues that the Court cannot determine on a class-wide basis whether a class member was deceived (some, for example, never received or paid invoices and others expected to receive and pay for an

index with their transcript), whether the amount that U.S. Legal Support billed for the indices was "unfair" because the perception of fairness of the charge will differ from customer to customer, and whether the billing practice caused the class member a loss (again, because some customers knew of the charge, felt it was reasonable, and agreed to pay for it).   U.S. Legal Support also argues that the plaintiffs have not set forth a reasonable methodology for the generalized proof of damages.   U.S. Legal Support makes roughly the same arguments with respect to the unjust enrichment claim.   U.S. Legal Support finally argues that a class action is not the superior method of adjudicating this case because there are significant manageability problems given the number of individualized issues.

##### 2. *Glenn J. Webber, P.A. v. Esquire Deposition Servs., LLC, et al.*

The *Webber* plaintiff is a law firm that employs attorney Glenn Webber.   The record indicates that Webber has taken over 1,000 depositions in his career, a volume largely attributable to his previous concentration on insurance defense matters.   For the past ten years, Webber has received word indices with the transcripts he has ordered. Webber, however, claims not to use these indices because he prefers to create his own. For as long as he has ordered transcripts from defendant Esquire, Webber has not complained to Esquire about its practice of including indices with his transcripts, has never personally (or through his support staff) inquired with Esquire about the indices or their cost, and has paid the invoices as submitted.

Webber's law firm's mail-room practice ensures that Webber never sees invoices related to transcripts.   The record indicates that Webber's staff sends him the transcript (including index).   Invoices, however, are passed along to Webber's wife, a former court reporter, who is aware of the inclusion of indices with transcripts based on her prior employment.   The firm's practice is to pay all invoices (including invoices relating to transcripts) without further inquiry unless the invoice in question requires payment of a particularly large sum (for example, if the invoice is for payment of an expert witness' fee).

Since filing this lawsuit, the Webber firm has continued to order depositions from Esquire without inquiring about what was included in the transcript and without asking

that Esquire omit the index or charge a lesser price for the index.  Webber claims that ordering those transcripts was a mistake.

Although the plaintiffs agree that the only proper class members are the ultimate payors of the charges for the index pages, Esquire contends that the proposed class is not adequately defined or ascertainable.  In particular, Esquire contends that it is impossible to determine who actually paid for the transcripts in question because transcripts are typically ordered by attorneys and the costs are either passed on to the client or absorbed (if, for example, the attorney represented the client on a contingency basis and the attorney's client did not prevail).  An additional problem with the proposed class, according to Esquire, is that class membership is fluid.  For instance, an attorney who has not been reimbursed by his client may be the proper class member at one moment, but class membership will shift to his client once the attorney is reimbursed for the costs he advanced.  Class membership could shift again if the court awards costs or an insurance company covers the costs of the transcript.  Further, it is possible that the attorney and client will both be class members if the attorney decided to offer the client a discount or absorbs some portion of the litigation expenses.  The task of determining who holds the claim would require attorneys to review their records and individually determine whether they passed on the costs of the transcript to their clients or were reimbursed from another source, a huge administrative task.

Esquire also contends that the proposed class fails to meet the commonality, typicality, and predominance requirements of Rule 23.  Esquire's challenge to the commonality requirement (as concerns issues of law) is based on whether FDUTPA applies to ultimate payors that reside outside of Florida.  With respect to issues of fact, Esquire argues that individual issues predominate because there are customers who had actual knowledge of the billing practices and nevertheless purchased transcripts with indices, some customers have negotiated rates, and Esquire has issued many different kinds of invoices over time.  Further, Esquire argues that FDUTPA requires the Court to consider whether an allegedly deceptive practice is likely to mislead a consumer acting reasonably in the same circumstances.  This aspect of FDUTPA would require the Court to undertake an individualized examination of the prospective class members to ascertain the circumstances under which each class member purchased the transcript.  Esquire also

argues that there could be conflicts among class members because attorneys have an ethical obligation to ensure that the costs they pass along to clients are reasonable and, if they are passing along costs that are unfair or deceptive, the attorneys may have breached this obligation to their clients.  Finally, Esquire argues that the Court should not certify the class because the damages determination cannot be completed on a class-wide basis, primarily because individuals value the indices differently.

### 3.   *Public Concepts LLC v. Veritext Corp.*

Plaintiff Public Concepts is a political consulting firm that has been sued several times for defamation.  Public Concepts claims to have paid for only one Veritext transcript, unlike the thousand transcripts for which the Webber firm has initially paid.  As with the above-described cases, Public Concepts relied on its lawyer to order transcripts.  Public Concept's lawyer concedes that he uses the word indices and finds them valuable.  While he values the indices, Public Concept's lawyer agrees that other attorneys may value the indices differently.

For many of the same reasons argued in the *Adelson* and *Webber* cases, Veritext argues that the Court should not certify the proposed class.  Veritext argues that existing records render it virtually impossible to determine who ultimately paid for indices and, therefore, who qualifies for class membership.  Further, Veritext argues that individual issues predominate and a class action is not the superior method of adjudicating the dispute.  For instance, Veritext argues that the plaintiffs will be unable to establish causation under FDUTPA on a class-wide basis because some of Veritext's customers may have known about the index and the related charge.  Further, some of Veritext's clients specifically negotiated for or ordered word indices at a prescribed rate (including the same rate as other portions of the transcript) and cannot reasonably assert that they were deceived.  Veritext also argues that damages cannot be proven on a class-wide basis because the value of word indices will vary from customer to customer.  According to Veritext, the Court should also decline to certify the class because there are significant manageability challenges, primarily because it is difficult to determine who ultimately paid for the indices and how they value the indices.  Veritext also argues that the commonality, typicality, and adequacy requirements of Rule 23(a) are unsatisfied.  With respect to the commonality and typicality elements, Veritext's arguments resemble those

10

made by Esquire and U.S. Legal Support.  In addition, Veritext argues that Public Concepts is not an adequate class representative because, since Public Concepts has admitted to violations of Florida's elections laws, it lacks the integrity necessary to fulfill the fiduciary role of class representative.

## LEGAL STANDARD

To obtain class certification under Rule 23 of the Federal Rules of Civil Procedure, the plaintiffs must meet each of the requirements specified in Rule 23(a) and at least one of the requirements in Rule 23(b).  Fed. R. Civ. P. 23.  Rule 23(a) requires plaintiffs to demonstrate that the proposed class satisfies the prerequisites of "numerosity, commonality, typicality, and adequacy of representation." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187-88 (11th Cir. 2003) (citation omitted). The plaintiffs seek class certification under Rule 23(b)(3). To certify a Rule 23(b)(3) class, the plaintiffs must demonstrate that (1) questions of law or fact common to class members predominate over any questions affecting only individual members and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3); *Vega v. T-Mobile U.S.A., Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009).

"Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug*, 350 F.3d at 1188 n.15.  "It is inescapable that in some cases there will be overlap between the demands of [Rule] 23(a) and (b) and the question of whether [a] plaintiff can succeed on the merits." *Huff v. N.D. Cass Co. of Ala.*, 485 F.2d 710, 714 (5th Cir. 1973) (en banc).  "Thus, the principle that district courts should not evaluate the merits of plaintiff's claims 'should not be talismanically invoked to artific[i]ally limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements.'"  *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009) (quoting *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir.1984)); *see also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 & n.12 (1978) ("[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues

comprising the plaintiff's cause of action.' . . . 'The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.'") (emphasis and citations omitted).

Finally, district courts have ample discretion in deciding whether to certify a class. An important consideration is whether the proposed class action is manageable, and this consideration is committed to the district court's discretion particularly "because [district courts] 'generally [have] a greater familiarity and expertise' with the 'practical . . . and primarily . . . factual' problems of administering a lawsuit 'than [do the] court[s] of appeals.'" *Andrews v. Am. Tel. & Tel.*, 95 F.3d 1014, 1022 (11th Cir. 1996).

## **ANALYSIS**

In this section the Court concludes that it should not certify the proposed classes because of significant manageability concerns and because both FDUTPA and the unjust enrichment claim require the consideration of factual matters that will significantly vary from putative member to putative member. Further, because the Court concludes that class certification is inappropriate and the Court's jurisdiction was premised on minimal diversity requirements in the Class Action Fairness Act of 2005, the Court dismisses these lawsuits for lack of subject matter jurisdiction.

### A. **Manageability Concerns**

Manageability is the most salient problem with the plaintiffs' proposed classes. The plaintiffs have argued that the manageability problems are *de minimus* because class members could be notified by publication or identified from the defendants' own records.

The problem with this argument is that it fails to account for many of the realities surrounding the ordering of court-reporting services. The record in these cases demonstrates that court-reporting services are generally ordered by attorneys. (In fact, none of the non-attorney plaintiffs before the Court indicated that they personally ordered the services of a court reporter.) As a result of this practice, the defendants' records only reveal the names of the attorneys who ordered their services, without regard to who ultimately bore the cost of the defendants' services, that is, the class members. In many cases, whether the costs of the court-reporting services are passed on to the attorneys' clients depends on the fee agreement between the attorney and the client. Some attorneys

represent their clients on a contingency fee basis.  This may mean that the attorney absorbs all costs unless his client prevails.  If the client prevails, then the attorney deducts the costs from the settlement proceeds.  In many other cases, however, clients hire attorneys under engagement agreements that require the client to periodically reimburse the attorney for any costs, including the cost of court-reporting services, incurred in connection with the client's case.  Because of the varying fee arrangements, it is impossible to ascertain the ultimate payor without requiring all of the defendants' customers to produce their accounting records so that the Court or an appointed administrator can determine whether the costs were absorbed by the attorney or the client. Adding to this task is the fact that costs may ultimately be absorbed by the losing party if the Court enters an order shifting costs or an insurer pays the costs.

Even after undertaking the Herculean task of determining the ultimate payor, numerous manageability problems remain.  For instance, some attorneys may offer their client a discount on court-reporting expenses.  This means that it is possible that, on some transactions, both the attorney and his client will be ultimate payors.  A further problem is that class membership is fluid:  attorneys will be class members until their clients reimburse them for court-reporting costs either through settlement proceeds or after paying their attorneys' invoice.  This complication would require the Court or its appointed administrator to constantly inquire whether the previously identified class member still has a claim.

Further, because of the law attendant to FDUTPA and unjust enrichment claims, whether an individual has a claim largely depends on individualized factors.  For instance, some class members have negotiated special rates with the court-reporting firms and, in some instances, index charges have been a subject of the negotiation.  As discussed below, some law firms have not only agreed to but insist on paying the same per-page rate for transcript and index pages, and other law firms likely have other negotiated agreements.  In fact, the plaintiff's law firm—Boies, Schiller & Flexner LLP—has secured an agreement with one of the defendants under which the firm pays nothing for word indices.  Boies Schiller's agreement with that court-reporting firm is highly negotiated as reflected in the detailed five-page court-reporter agreement.  This agreement includes several exhibits, one of which is a table setting forth agreed rates in

different localities.  While Boies Schiller has conceded that it is not a class member, one would not know that without either its concession or a thorough examination of the defendants' records.  This problem would exist with other law firms that have negotiated special rates.   And where rates have been negotiated, individualized legal issues will prevail, because Florida law is very protective of parties' right to contract and generally refuses to rescue firms or individuals from purportedly bad bargains.   *See, e.g., Gainesville Health Care Ctr., Inc. v. Weston,* 857 So. 2d 278, 284 (Fla. 1st DCA 2003) ("'People should be able to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fair minded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.'") (quoting 14 Samuel Williston, *A Treatise on the Law of Contracts* § 1632 (3d ed.1972)).

The *Webber* case has yielded several examples of how individualized inquiry reveals relevant information about a class member that may preclude the putative member from class membership.   Webber, for instance, has an office management structure that leaves him unaware of how much vendors have charged him for their services.   Further, Webber has continued to order transcripts from Esquire even after filing this lawsuit.   In addition, Webber's wife, an employee of his law firm, has experience as a court reporter and knowledge of court-reporting firms' business practices. And, finally, Webber is an experienced user of court-reporting services, having ordered more than a thousand transcripts in his career.  These peculiarities surrounding Webber's law practice affect the strength of his claim against Esquire by affording Esquire with a series of defenses (e.g., estoppel or ratification) that may not apply on a class-wide basis. But without deposing Webber, his wife, and other firm employees, it would have been impossible to know that those peculiarities existed.   As U.S. Legal Support's attorney pointed out at oral argument, the defendants have been able to present a wealth of information about the Webber firm, its experience, practices, and employees, because

14

that firm is the lead plaintiff in the case against Esquire and, as a result, the Webber firm has been scrutinized through the discovery process.  The Webber firm, however, has also used the services of U.S. Legal Support and, therefore, is a prospective member of that class.  In this way, the discovery of the special circumstances surrounding Webber not only preclude him from serving as the lead plaintiff, but may also preclude him from membership in at least one of the other proposed classes.  It would be impractical, if not virtually impossible, to conduct the same level of discovery for every putative class member.   Yet, as Webber's situation confirms, such detailed discovery would be necessary to give the defendants a fair chance to defend against or avoid paying illegitimate claims.

In short, certifying this class would result in a huge and unreasonably expensive and time-consuming undertaking to determine individualized circumstances that would burden the Court, defendants, and third-parties, without providing a countervailing benefit that would justify such an expenditure of money and time.  Therefore, after reviewing the record, the Court finds as a factual matter that individualized issues of fact and law predominate and, if certified, the proposed classes would present unwarranted manageability problems to the Court.  Accordingly, for this reason and those below, the Court declines to certify the proposed classes.

**B.     The FDUTPA Claim**

FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."   Fla. Stat. § 501.204(1).   To establish an actionable violation of the FDUTPA, a plaintiff must demonstrate a deceptive act or unfair practice, causation, and actual damages. *City First Mortgage Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008).

The legislature mandated that in construing § 501.204(1), courts should give "due consideration and great weight" to the "interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2006."  Fla. Stat. § 501.204(2).  In addition, the plaintiffs seek relief under Fla. Stat. § 501.211 which authorizes redress for individuals who have

been aggrieved or suffered a loss as a result of a "violation of this part."  "Violation of this part" is a defined term that means

> any violation of this act or the rules adopted under this act and may be based upon any of the following as of July 1, 2006:

> (a)     Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 et seq.;

> (b)     *The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts*;

> (c)     Any law, statute, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

Fla. Stat. § 501.203(3) (emphasis supplied).

FDUTPA closely resembles Section 45(a)(1) of the FTC Act.  *See* 15 U.S.C. § 45(a)(1) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.").  The FTC Act empowers the Federal Trade Commission to regulate acts or practices that may violate § 45(a)(1).  15 U.S.C. § 57a.

### 1.     Is the Practice of Charging the Same Per-Page Rate for Transcript and Index Pages an Unfair Practice Under FDUTPA?

The FTC initially defined "unfair" by regulation.  Eventually, Congress incorporated the FTC's definition of unfair into the FTC Act.  Under 15 U.S.C. § 45(n), the FTC may not "declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."[3]  Each of these considerations counsels against certification of the proposed class.

---

[3]     The Florida Supreme Court articulated a less specific definition of "unfair practice."  It defined an unfair trade practice as "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

The plaintiffs are unable to show on a class-wide basis that the alleged injury was not "reasonably avoidable."  Some lawyers and other users of court-reporting services—particularly those who are fairly sophisticated (or, at least, experienced) users of such services—could reasonably avoid the index charges by simply relying on their experience and requesting that the court-reporting firms omit (or charge a different per-page rate for) the indices from any transcripts they order.  A class definition that includes experienced and novice users of court-reporting services, necessarily includes those with differing abilities to reasonably avoid the allegedly unfair charge.  For example, contrast a novice user similar to Public Concepts with a highly experienced user like attorney Webber.  One would have no idea (or, at best, a minimal idea) what to expect after ordering the services of a court reporter.  The other would likely have developed knowledge and preferences as to court-reporting firm, format of transcript, pricing, etc.  In the latter category, the plaintiffs either knew or should have known that indices were included in and charged as part of the transcripts.  This circumstance may also undermine the named plaintiffs' adequacy to serve as class representatives, Webber being a good example.[4]  Further, individualized inquiry is necessary to determine whether the index charges were reasonably known and avoidable.  This is because the court-reporting firms delivered invoices specifying the per-page rate and the total charge, which invoices reflect and could have been used to easily discover that the charge for index pages was the same as the charge for other pages.  Finally, the record in each case indicates that some class members negotiated special rates with the defendants.  Those class members who negotiated special rates likely had an additional opportunity to avoid or reduce index charges.

In addition, the "countervailing benefits to users" factor counsels against class certification.  The potential value of indices to users varies greatly.  The usefulness and, therefore, value, of indices depends, in part, on the length of the transcript in question.  For instance, an index may be extremely valuable to an attorney reviewing a deposition

---

[4]     As indicated above, Webber's office has instituted a practice under which Webber never sees the invoices sent by court-reporting firms.  Instead, the billing is handled by Mrs. Webber, a former court reporter who was aware of the practice of including word indices with transcripts.  In these respects, Webber is set apart from many class members, and the Court finds that Webber is not an adequate class representative.

or hearing transcript that is very lengthy.  On the other hand, the value of the index may be comparatively small if the transcript in question is relatively short (e.g., the transcript of a records custodian deposition).  The proposed class definition does not and could not reasonably distinguish between these two types of class members.  Yet those putative class members who received indices for very lengthy proceedings may have received a countervailing benefit such that the practice could not be considered unfair.  Further, the value that attorneys place on word indices is highly subjective and variable.  Some lawyers (for example, Webber) place little or no value on word indices and refuse to use them, while other lawyers consider them a very valuable part of a transcript.[5]  The record supports the subjective nature of the indices' value.  When one large law firm—Weil, Gotshal, and Manges LLP—solicited bids from court reporters, it included among the specifications distributed to the potential bidders a requirement that "[a]ll transcripts shall contain at the back of the transcript a word index (with page references) for all key words and phrases."  *See* Memorandum in Opposition to Certification (*Veritext*) Exhibit I at § 4.3.  Therefore, unlike Webber, the Weil Gotshal firm obviously values word indices as a part of transcripts.  The plaintiffs' expert, William Chandler, after initially opining as a part of his damages analysis that the indices have no value, acknowledged that word indices have some value to some individuals and a lesser degree of value (or no value) to others.  In his initial written expert report, Chandler claimed that "[n]o [c]lass member benefited from being charged a per-page transcription rate for pages that did not involve transcription services."  *See* Report of William Chandler (*Veritext* case) at ¶ 29.[6]  But his

---

[5]    Indeed, the record includes affidavits from many attorneys who value word indices.  Attorneys Alan Goldfarb, Miles McGrane, III, Ronald Ponzoli, Gary Fox, and Robert Parks declared that they expect to receive and value word indices.  Wayne Grant, a Georgia attorney, uses Esquire and not only knows that transcripts include word indices but frequently uses them and has found them to be a "worthwhile and important part of the transcript."  Parks contends that in his "judgment and experience it is appropriate to charge for the word index at the same per page rate as for the testimonial portion of the transcript."  And as discussed elsewhere in this order, other large consumers of court-reporting services—including the New York Office of the Attorney General and the law firm of Skadden, Arps, Slate, Meagher & Flom LLP—value word indices and request their inclusion with any purchased transcripts.

deposition testimony supports the fairly obvious conclusion that word indices have a subjective value depending on the user and the circumstances:

> Q.    But you would agree that for some people the word index would have a value?
> A.    In some cases, it could.
>       [Plaintiff's Attorney]:        Objection to the form.
> A.    In some cases it could.  In other cases it may not.

Deposition of William Chandler at 86:14-19.  Another exchange, ironic because of the nature of the plaintiff's attorney's objection, further supports the notion that damages cannot be calculated on a class-wide basis:

> Q.    Do you have any sense of what the market value of a word index is?
>       [Plaintiff's Attorney]:        Objection to form.  Beyond the scope of his report.  *Calls for speculation* and vague.
>       THE WITNESS:        No.    I think I've indicated in my report and testimony that, you know, if that's a necessary component of the damages, it depends upon—I've not even yet been retained to calculate damages, but assuming that I am, that would be one of the issues that I would look into.

*Id.* at 172:25-173:1-11 (emphasis supplied).  And that is precisely the problem with damages in these cases: they are speculative and contingent on numerous individualized factors.    Public Concept's attorney in the underlying defamation case concisely summarized the point in his deposition when he testified that "different attorneys have different opinions about the value of a word index, and I believe I also testified that I use them" because word indices "save[ ] the client money in the sense that if I spent more time with a transcript to find the material I was looking for, I would have to bill the client for that."  *See* Expert Report of Bradley J. Pinne (submitted in *Veritext*) at 15-16 (quoting Deposition of L. Martin Reeder, Jr.).  Despite the obvious and significant differences in valuing the indices, the proposed classes include customers who have received both great and little benefit from the word indices.  And determining how each valued the indices would require an exhaustive, individualized inquiry.

Further, unfair practices must cause "substantial injury" to be actionable and, in these cases, the proposed definition includes firms and individuals who have suffered no

---

[6]       Chandler submitted a report in support of each plaintiff's case.  In each report, Chandler concluded that no class member benefited from non-transcribed transcript pages.

injury.  As indicated above, different attorneys value word indices differently.  Those attorneys (or the ultimate payors) who value word indices would be uninjured, but the proposed definition would nevertheless include them as class members.

Even if the Court applied the more malleable test set forth in the *Beacon Property* case, the Court would conclude that it should not certify the proposed classes.  Under that test, the plaintiffs must show both that the defendants' practices violate established public policy and are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  The plaintiffs could not prove either factor on a class-wide basis.

As noted earlier in this order, there is no established public policy on what constitutes fair pricing for word indices.  It is telling, however, that the federal judiciary has adopted guidelines for its own court reporters that specifically allow the same per-page rate for transcript and index pages.  *See* 6 GUIDE TO JUDICIARY POLICY *Court Reporting* § 520.46 (2009) ("The court reporter may charge for the index page as a full page of transcript.")  This District's internet website posts a schedule setting forth the per-page fees that its court reporters may charge for transcripts without drawing a distinction between appropriate fees for index and non-index pages.  *See* Maximum Transcript Rates Per Page for All Parties (June 2009 Revision), *available at* http://tinyurl.com/39o2ctp (last visited May 24, 2010) (further information regarding ordering transcripts from the District Court is available at http://www.flsd.uscourts.gov under the "Transcript Information" heading).  In fact, the record in opposition to the motion for certification in the *Webber* case includes the transcript (with word index) of a joint hearing held early on in these cases.  Attached to the transcript is an invoice from the Court's official reporter for $116.58 for a 29-page transcript priced at $4.02 per page.  Notably, the invoice does not distinguish between index and other pages; in other words, the invoice charges for 29-pages of transcript without distinguishing between transcript and index pages.  The hearing itself (that is, the exchanges between the Court and counsel) is captured in 20 pages of transcript; the remainder of the transcript consists of a cover page (1 page), appearance pages (2 pages), certification page (1 page), and index pages (5 pages).  By comparing the transcript to the invoice one is able to easily ascertain that the Court's reporter charged the same amount for transcript and index pages.  And when the New York Office of the Attorney General solicited bids for court-reporting

services, the request for proposals specified that the selected firms would provide a word index with the transcript.  The bid form puts transcript and index charges in a single price category, thereby requiring that all bidders quote the same price for all pages.  *See* Memorandum in Opposition to Certification (*Veritext*) Exhibit K at 10, 20.[7]  That the Court's official reporters and the New York Attorney General's Office have the same pricing and billing practice as the defendant court reporters tends to show that there is no established public policy prohibiting the conduct that the plaintiffs decry.

The Court is unaware of any authority or logic indicating that the defendants' billing practice is "immoral, unethical, oppressive, or unscrupulous."  (The Court addressed the substantial injury factor earlier in this order.)  The record in the case establishes the opposite.  As noted below, some users of court-reporting services even consider it a bargain to pay the same price for transcript and index pages.  While the Court doubts that the practice in question is "immoral, unethical, oppressive, or unscrupulous" under any circumstance, under the most permissive possible application of that standard, the Court would conclude that whether the practice is immoral, unethical, oppressive, or unscrupulous depends on the individual experience or sophistication of the user.  As discussed in further detail below, such a standard could not be appropriately applied on a class-wide basis.

For these reasons the Court concludes that the plaintiffs cannot show on a class-wide basis that the practice of charging the same per-page rate for transcript and index pages is an unfair practice under FDUTPA.

---

[7]    This document, filed under seal, contains no proprietary information because it is a document generated by the New York state government and distributed publicly to facilitate competitive bidding.  Accordingly, the Court requests that Veritext re-file this exhibit so that it is made a part of the public record.  The Court further requests that all parties review all sealed exhibits and re-file any exhibits that lack proprietary information (including, for example, information about billing policies or negotiation practices or specific examples of negotiated deals) so that those documents become a part of the public record.

### 2. Is the Practice of Charging the Same Per-Page Rate for Transcript and Index Pages a Deceptive Practice Under FDUTPA?

Florida courts have followed the federal standard defining deceptive trade practices. *See, e.g., Davis v. Powertel*, 776 So. 2d 971, 974 (Fla. 4th DCA 2000) ("According to the federal decisions, a deceptive practice is one that is 'likely to mislead consumers.'"); *see also FTC v. Career Info. Servs., Inc.*, No. 1:96-CV-1464-ODE, 1996 WL 435225, at *4 (N.D. Ga. June 21, 1996) ("An act or practice is deceptive under Section 5(a) if it involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances.").

Florida courts have been less than clear as to whether proof of reliance is required to state a claim under FDUTPA. At least one Florida court has held that proof of reliance is not required, and the Eleventh Circuit subsequently followed that court in an unpublished opinion. *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009); *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000).[8] For the purpose of this order, the Court assumes that Florida law does not

---

[8] The Court recognizes that in granting class certification in *Fitzpatrick v. General Mills, Inc.*, 263 F.R.D. 687, 694 (S.D. Fla. 2010), it relied on *Cold Stone*. While the Court recognizes that *Cold Stone* was an unpublished opinion, the Court nonetheless relied on that case because it was the most on-point statement of law from the Eleventh Circuit on the reliance requirement, and the Eleventh Circuit's conclusion was not inconsistent with the conclusion of some Florida courts. In *Cold Stone*, the Eleventh Circuit, relying on *Davis*, concluded that proof of reliance is not required under FDUTPA. But despite this pronouncement, the reasoning in *Cold Stone* may suggest that reliance could be a factor in the FDUTPA analysis. The Eleventh Circuit considered that, even though certain individuals had made representations to the plaintiffs regarding the plaintiffs' business prospects, after the representations the plaintiffs received Cold Stone's franchise agreement. That agreement stated that Cold Stone franchisees did not have authority to make representations about profit margins, included detained financial information, noted that results would vary from franchise to franchise, warned that the prospective franchisee should accept the risk of doing more poorly than the figures provided, and advised the prospective franchisee to conduct an independent investigation of the costs and expenses associated with running a Cold Stone franchise. The Eleventh Circuit then concluded that the district court did not err in granting summary judgment in favor of Cold Stone on the plaintiff's FDUTPA claim because "[u]nder [those] circumstances, it [was] not likely that a consumer acting reasonably would have been deceived by the alleged statements made by the two Cold Stone franchisees." 332 F. App'x at 568. In short, the *Cold Stone* court appears to conclude that the plaintiff's

require proof of reliance, since that determination is not dispositive to the Court's ruling in this case.[9]

Irrespective of the reliance requirement, to state a claim under FDUTPA, the act or practice in question must be one "likely to deceive a consumer acting reasonably in the same circumstances."  *State v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004).

The modification of "acting reasonably" by "in the same circumstances" indicates a hybrid standard that may be objectively established as to mindset but subjectively established as to context.  The objective element—reasonableness—does not require the Court to consider the plaintiff's individualized state of mind.  In other words, the plaintiffs' individualized dispositions or beliefs do not on their own negate or create a FDUTPA violation.  On the other hand, the subjective element—that the circumstances must be similar—necessitates inquiry into the context of the alleged offense; that is, one can only assess reasonableness when the inquiry requires consideration of the factual circumstances that counsel a reasonable person to act in a particular way or hold a

---

reliance on certain representations was unreasonable under the circumstances presented there, even though the court had concluded that reliance is not an element of a FDUTPA claim.  In view of the Eleventh Circuit's apparent determination that, in some circumstances, proof of reliance may be required under FDUTPA, the Court recognizes that, because there are a variety of relevant circumstances among users of court-reporting services, proof of reliance may be an appropriate requirement in this case.

[9]     The plaintiffs have relied on the Court's opinion in *Fitzpatrick* in their briefs and oral argument, as if to suggest that the Court could not reasonably certify that class without also certifying these classes.  As the Court expressed at oral argument, the certification decision in *Fitzpatrick* was a close call and flowed largely from the Court's reliance on the single pronouncement in *Cold Stone*.  That certification decision is presently on appeal before the Eleventh Circuit.  Regardless of the outcome of the *Fitzpatrick* appeal, these cases differ in several respects.  One example of the differences between these cases and *Fitzpatrick* is that in the present cases consumers received the benefit of the indices they purchased and, to the extent they did not value the indices or valued them less than other pages, could have requested the deletion of the index or sought a price adjustment.  In contrast (and assuming the truth of the plaintiffs' allegations), without scientific studies, the *Fitzpatrick* class members had no way of knowing that the yogurt they purchased lacked the digestive benefits advertised to consumers and would have continued purchasing the yogurt without knowing that it did not function as advertised.

particular belief.  *See, e.g.*, *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 54 (N.Y. App. Div. 2004) ("Deceptive or misleading representations or omissions are defined objectively as those 'likely to mislead a reasonable consumer acting reasonably under the circumstances,' i.e., the plaintiff's circumstances.").

In some cases, the subjective component of this standard can be met on a class-wide basis.  One example might be the *Latman* case in which Florida's Third District Court of Appeal held that a trial court erred when it declined to certify a class of cruise ship passengers who had purchased tickets that included a "port charge" that was nothing more than a profit center for the cruise line.  *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 704 (Fla. 3d DCA 2000).  In *Latman* the Third DCA reasoned that reasonable consumers would probably interpret the term "port charges" as a pass-through charge that the cruise line was required to forward to port authorities and, therefore, passengers were misled when they paid a fee that went to and remained with the cruise line as profit.  *Id.* at 703.  Another example might be the example discussed in *Latman* of the merchant that charges a greater sales tax than allowed by law.  *Id.* at 703 ("We would not hesitate to say that an intentional overcharge of sales tax, which is kept by the company itself, is an unfair and deceptive trade practice and that the consumer must be repaid.  That is so even though the consumers clearly were willing to pay the price charged—in the hypothetical example, they actually paid the sales tax overcharges—nor would it make a difference that the consumers paid no attention to the sales tax amount.  We think such a claim would be actionable under FDUTPA.").

In this case, however, the reasonableness conclusion depends on numerous individualized inquiries that would fly in the face of the requirement that individual issues not predominate over those common to the class.

Some putative class members were obviously aware of the indices, valued them, and specifically addressed the indices in their negotiations for court-reporting services.  For example, in the *Public Concepts* case, the Weil Gotshal firm required that "[a]ll transcripts shall contain at the back of the transcript a word index (with page references) for all key words and phrases."  Further, the law firm of Skadden, Arps, Slate, Meagher & Flom LLP—a New York-based law firm with a litigation group consisting of

24

"approximately 500 attorneys" globally[10]—secured an agreement with Veritext under which Veritext agreed to "provide a word index at the end of the transcript" at a rate that is the "same as the per page charge."  Skadden's deal suggests that it may value the word index more than the transcript pages and, therefore, wanted to ensure that it obtained the attractive bargain of paying the same amount for index and transcript pages.

Others continued to purchase word indices under the same terms after discovering the practice that these cases have called into question.  In some cases the continued purchases may have been the result of an error.[11]  Other attorneys, however, may have deliberately chosen to continue patronizing Esquire, U.S. Legal Support, or Veritext, after determining that their court-reporting firm of choice was charging the same amount for transcript and index pages.  *See, e.g.,* Declaration of Attorney Wayne Grant at ¶ 15 ("I am aware that Esquire and other court reporting firms charge a per page rate for the word index at the same rate as charged for the transcribed testimony pages.  From my experience, I do not believe that this per page rate for the index is unreasonable or unfair.").  Some knew that they were being charged the same rate and consider that a legitimate practice.  *See, e.g.,* Declaration of Attorney Alan Goldfarb ("I do not consider it unreasonable that a court reporting service charges the same price for a word index, that is, a per-page rate, as it does for the pages containing the transcribed word.").

Some putative class members are novice attorneys with little understanding of court-reporting practices, while others, like plaintiff Webber, are experienced attorneys with thousands of depositions in their past.

Because the reasonableness of a customer's conduct depends on many individualized factors, the Court concludes that class certification is not appropriate in these cases.

---

[10]     *See* Skadden, Arps, Slate, Meagher & Flom LLP Litigation Group Profile *available at* http://tinyurl.com/37o6lxb (last visited May 25, 2010).

[11]     For example, Webber has admitted to placing at least one order after filing his lawsuit against Esquire.  This fact also sets Webber apart from other class members because it creates a unique factual issue and introduces a possible defense against his claim that may be inapplicable on a class-wide basis.  In addition to the reason set forth earlier in this order, the Court finds that Webber's continued purchase of transcripts with indices renders him an unsuitable class representative.

### C.        The Unjust Enrichment Claims

In Florida, "[t]he essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Rollins*, 951 So. 2d at 876.  "[B]efore it can grant relief on this equitable claim, a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist."  *Vega*, 564 F.3d at 1274. Because this inquiry into equities is individualized, courts generally find that unjust enrichment claims are not appropriately certified for class treatment, as "common questions will rarely, if ever, predominate."  *Id.*  These cases are no different.  *See Green v. McNeil Nutritionals, LLC*, App. No. 2004-0379-CA, 2005 WL 3388158, *9 (Fla. Cir. Ct. 4th Dist. Nov. 16, 2005) ("In the unjust enrichment count, each [class] member would have to show evidence as to why the purchase was made to determine whether equity warrants the return of the purchase price. Unjust enrichment may not be appropriate if a consumer did not rely on the alleged deceptive acts.").

### D.        Subject Matter Jurisdiction

Having determined that this matter is inappropriate for class action certification, the Court next considers its jurisdiction over the claims of the individual plaintiffs.  "A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."  *Fitzgerald v. Seaboard System R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985).  "[L]ower federal courts are empowered to hear only cases for which there has been a congressional grant of jurisdiction, and once a court determines that there has been no grant that covers a particular case, the court's sole remaining act is to dismiss the case for lack of jurisdiction."  *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1260 (11th Cir. 2000).

In this case, the plaintiffs allege that the Court possesses federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), which confers jurisdiction in class actions where the controversy exceeds $5 million and the putative class includes more than 100 members.  Section 1332(d) only requires "minimal diversity"—that is, "only one member of the plaintiff class—named or unnamed—must be diverse from any one defendant."

*Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1194 n.24 (11th Cir. 2007). As a result of the Court's refusal to certify the class and because the complaints do not state a claim for relief under federal law, the only remaining source of jurisdiction is 28 U.S.C. § 1332(a), which requires complete diversity of citizenship and satisfaction of a $75,000 monetary threshold. Because the Court's decision not to certify the proposed classes eliminates § 1332(d) as a source of jurisdiction and it appears that these cases do not satisfy the requirements of § 1332(a), the Court concludes that it lacks subject matter jurisdiction over these cases. Therefore, each of the above-captioned cases is dismissed without prejudice for lack of subject matter jurisdiction. *See Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677 (S.D. Fla. 2008) (dismissing FDUTPA claims for lack of subject matter jurisdiction in light of denial of motion for class certification).

## CONCLUSION

For the reasons set forth above, the motions for class certification are denied. Because the Court's denial of the motions divests the Court of subject matter jurisdiction, these cases are dismissed. All pending motions (with the exception of the motion for attorneys' fees in *Webber*) are denied as moot. The Clerk of the Court is directed to close these cases.

DONE and ORDERED in Chambers, Miami, Florida, May 27, 2010.

_____
Paul C. Huck
United States District Judge

**Copies furnished to:**
All counsel of record.